SCAN

JS-6

O

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EDWARD MACIEL                    ) No. CV 06-00249 RSWL (CWx)
                                 )
            Plaintiff,           )
                                 )      TRIAL ORDER
            v.                   )
                                 )         AND
CITY OF LOS ANGELES, et          )
al.                              )      JUDGMENT
                                 )
            Defendants.          )
_____)

_____

    This case involves Plaintiff Edward Maciel's various claims against the City of Los Angeles for violations of the Fair Labor Standards Act.  The alleged violations are based on the Los Angeles Police Department's ("LAPD") policy of not compensating for donning and doffing activities and LAPD's alleged failure to ensure Edward Maciel received his required meal breaks.

//

On January 15, 2008, the above matter commenced in a bench trial before this Court.  The trial lasted seven days and included the presentation of multiple witnesses and the submission of various exhibits.  Having considered all the evidence admitted at trial, as well as the closing briefs submitted by both parties, **THE COURT NOW FINDS AND RULES AS FOLLOWS:**

**I.    BACKGROUND**

   A.   <u>Procedural Background</u>

   On December 14, 2005, Jay Vucinich and Edward Maciel filed a claim against the City of Los Angeles and others[1] for violations of the Fair Labor Standards Act (hereafter "FLSA"), various State Labor Codes and California's Business and Professional Code on behalf of themselves and "other employees similarly situated." (<u>See</u> State Court Complaint.)  The Complaint was properly removed to Federal Court on January 13, 2006.

   On July 21, 2006, the Court **GRANTED** Defendant City's Motion for Partial Summary Judgment and **DISMISSED** each of Plaintiffs' state law claims.  (<u>See</u> July 21, 2006 Order.)

   On March 27, 2007, Plaintiff Jay Vucinich voluntarily dismissed his claims against Defendant,

---

   [1]  All other Defendants have been dismissed.

leaving only Plaintiff Maciel's individual claims.
(Hereafter "Plaintiff" or "Maciel".)

On September 27, 2007, this Court **GRANTED in PART and DENIED in PART** the parties' cross motions for summary judgment.  As a result of this Order, the Court determined that the donning and doffing of the standard police uniform, excluding the utility or Sam Browne belt and Kevlar vest, was not compensable.  Moreover, the Court **DISMISSED** each of Defendant's state law affirmative defenses as well as any reliance on an advice of counsel defense.

B.   Factual Background

Plaintiff has been employed by the LAPD since 1994 and is currently a Patrol Officer II.  (1/15/2008 [Vol.I] at 96:10-11.)[2]  During his relevant[3] employment, Plaintiff was assigned to Newton Station and Central Division in Los Angeles.  (Id. at 21:13-19; 97:4-9.)  As a patrol officer, Plaintiff was predominantly assigned to a patrol car in which he and his partner would patrol an assigned area.  (1/15/2008 [Vol.I] 25:10-17.)  From 2004-2005, Maciel was stationed at Parker Station, which is a fixed post location where he acted as security.

─────────────

[2] All transcript and exhibit citations herein refer to the evidence and testimony in the civil trial in this matter.

[3] For the purposes of this analysis, the Court considers December 2002 through present to be the "relevant time period."

(Id. at 139:1-10.)  Maciel was occasionally placed on "hospital duty" which was an assignment involving escorting and monitoring arrestees who needed medical attention.  (1/16/2008 [Vol.I] at 31:2-19.)

During the relevant time period, the terms of LAPD employment were covered under collective bargaining agreements.  (See 1/23/2008 [Vol.II] at 19:10-18; see also Exhs. 207-209.)  The LAPD has two separate collective bargaining agreements relevant to the instant matter.  The first covers all sworn officers at the ranks of Sergeant and below; this would include Officer Maciel.  (Ex. 207.)  There is also a separate agreement covering the ranks of Captain and above.  (Ex. 207.)

The standard patrol uniform consists of trousers, shirt, boots/shoes, and the officer's personal safety equipment.[4]  Each officer who testified said that they performed at least some of the donning and doffing activities at the assigned police station.  (See, e.g., 1/23/2008 [Vol.II] at 31:7-12.)  Officers have individual lockers located at the police station which can be used to store their uniform and equipment. (1/15/2008 [Vol.I] at 30:22-25.)  Per the collective

---

[4] The personal safety equipment includes: a Kevlar vest, Sam Browne belt which contains the following: keepers, handcuffs, O.C. spray, flashlight, baton, radio, gun, ammunition and gun holster.

bargaining agreements, the LAPD does not compensate employees for any time spent donning or doffing the standard police issue uniform.  (1/15/2008 [Vol.I] at 25:1-6; Ex. 207.)

The LAPD operates on 28-day "deployment periods," which include two pay periods.  (1/24/2008 [Vol.II] at 167:12-22; 172:13-17.)  Typically, a sworn officer - like Plaintiff - who works a twelve hour shift, works 156 hours per deployment period.  (Id. at 199:7-8.) This twelve hour shift is actually scheduled for twelve hours and forty-five minutes and includes a forty-five minute unpaid break (hereafter "Code-7").  (Id.)  The evidence demonstrated that a patrol officer is required to follow certain procedures in order to receive their Code-7.  First, the patrol officer must request their Code-7, usually over the radio.  (1/16/2008 [Vol.II] at 183:2-21.)  If an officer is denied permission, then the officer must request a Code-7 a second time, later in their shift.  (Id.)  If a Code-7 is still not received, then an officer is required by written policy to submit an overtime sheet for the extra forty-five minutes worked.  (Id.)

Each time an officer works overtime, the LAPD policy requires that he or she submit an overtime request form.  (1/24/2008 [Vol.II] at 151:24-153:7.)

5

These forms are often referred to as "greenies." (Id.)
Each greenie must be approved by a supervisor prior to
being submitted to the payroll department. (1/15/2008
[Vol.I] at 66:12-67:2.)  The greenie is the only
mechanism the officer has for submitting overtime to
payroll. (1/24/2008 [Vol.II] at 151:24-153:7; 154:24-
155:5.)  Evidence at trial demonstrated that LAPD policy
requires that all overtime slips be approved, and all
employees compensated for any overtime submitted,
regardless of the amount of overtime or whether prior
approval was granted. (1/23/2008 [Vol.II] at 23:4-5.)

Each patrol unit (consisting of two patrol
officers) is required to complete a Daily Field Activity
Report (hereafter "DFAR.") (1/25/2008 [Vol.I] at 19:14-
20.)  The DFAR lists each of the officer's activities
for that shift. (Id.)  The DFAR is either submitted to
a supervisor at the end of the shift, or placed in an
in-box. (1/16/2008 [Vol.II] 152:10-153:6.) Although a
DFAR is not a payroll document, LAPD policy requires
that the Code-7, or lack thereof, be listed on the DFAR.
(1/16/2008 [Vol.I] 41:23-42:5) Plaintiff admits that he
never submitted any requests for overtime which were not
paid, nor did he expressly inform anyone he was working
uncompensated overtime. (1/16/2008 [Vol.I] at 19:6-
20:7.)  Plaintiff also admits that no supervisor ever
expressly told him not to submit overtime requests for

hours worked.   (<u>Id</u>.)

## II.  <u>LEGAL STANDARDS</u>

  A.   <u>Statute of Limitations</u>

  An employee is limited to two years of damages for
any FLSA violations, unless such violations are willful,
then damages can be increased to a three-year time
period.  29 U.S.C § 255(a).  An employer's behavior is
considered willful where the employer either knew, or
showed reckless disregard, as to whether its conduct was
prohibited by the FLSA.  <u>See</u> <u>McLaughlin v. Richland Shoe
Co.</u>, 486 U.S. 128, 129 (1988).  Actions are not willful
even if the employer acts unreasonably, so long as the
employer does not act recklessly.  <u>See</u> <u>id</u>.

  B.   <u>Fair Labor Standards Act Recovery</u>

  To establish a claim for unreported (and therefore
uncompensated) overtime under 29 U.S.C. § 207(a), a
plaintiff must demonstrate: (1) that he worked overtime
hours without compensation; (2) the amount and extent of
the work as a matter of just and reasonable inference;
and (3) that employer "suffered" or "permitted" him to
work uncompensated overtime.  <u>See</u> 29 U.S.C. § 203(g);
<u>Lindow v. United States</u>, 738 F.2d 1057, 1061 (9th Cir.

1984); <u>Pforr v. Food Lion, Inc</u>., 851 F.2d 106, 108 (4th Cir. 1987).

As defined in 29 U.S.C. § 203(g), "[T]he words 'suffer' and 'permit' [means for the employee to work] 'with the knowledge of the employer.'"  <u>Fox v. Summit King Mines</u>, 143 F.2d 926, 931 (9th Cir. 1944).  An employer who is armed with such knowledge cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation.  <u>See Forrester v. Roth's I.G.A. Foodliner, Inc.</u>, 646 F.2d 413, 414 (9th Cir. 1981).

C.   <u>Donning and Doffing</u>

Under the FLSA, employers must pay employees for all "hours worked."  <u>See</u> 29 U.S.C. § 207 (1999); <u>Alvarez v. IBP, Inc.</u>, 339 F.3d 894, 902-903 (9th Cir. 2003).  "Work," the Supreme Court has long noted, is "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer."  <u>See Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123</u>, 321 U.S. 590, 598 (1944).

Whether activity is "work" is simply a threshold

matter, and does not mean, without more, that the
activity is necessarily compensable.  Alvarez, 339 F.3d
at 902-903.  The Portal-to-Portal Act of 1947 relieves
an employer of responsibility for compensating employees
for "activities which are preliminary or postliminary to
[the] principal activity or activities" of a given job.
29 U.S.C. § 254(a) (1999).

    Not all "preliminary or postliminary" activities
can go uncompensated, however.  "Activities performed
either before or after the regular work shift," the
Supreme Court has stated, are compensable "if those
activities are an integral and indispensable part of the
principal activities."  Steiner v. Mitchell, 350 U.S.
247, 256 (1956); see also Mitchell v. King Packing Co.,
350 U.S. 260, 261 (1956); 29 C.F.R. § 790.7(h) (1999)
("An activity which is a 'preliminary' or 'postliminary'
activity under one set of circumstances may be a
principal activity under other conditions.").

    To be "integral and indispensable," an activity
must be necessary to the principal work performed and
done for the benefit of the employer.  Alvarez, 339 F.3d
at 902-903.

    29 C.F.R. § 790.8(c) states: "If changing clothes
on the employer's premises is merely a convenience to

the employee and not directly related to his principal activities, it would be considered preliminary or postliminary, rather than a principal activity."  But, if changing clothes on the employer's premises is required by law, rules of the employer, or the nature of the work, it would be an integral part of the employee's "principal activity."

The FLSA also contains an exception for "any time spent in changing clothes" that was excluded from compensation under "the express terms of or by custom or practice under a bona fide collective-bargaining agreement."  29 U.S.C. § 203(o) (1999).[5]

"Personal protective equipment is specialized clothing or equipment worn by an employee for protection against a hazard and is not clothing under § 203(o). General work clothes (e.g. uniform, pants, shirts, or blouses) are not intended to function as protection against a hazard and are not considered to be personal protective equipment."  <u>Alvarez</u>, 339 F.3d at 903.

///

---

[5] Hours Worked. -- In determining for the purposes of sections 206 and 207 . . . the hours for which an employee is employed, there shall be excluded any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee.

# III.  **ANALYSIS**

### A. <u>LACK OF CREDIBLE EVIDENCE PREVENTS PLAINTIFF FROM RECOVERING FOR ALLEGED MISSED CODE-7S</u>

LAPD rules require that each sworn employee who works a twelve hour shift be entitled to a 45 minute unpaid meal break. (Ex. 209.)  This Code-7 is understood as "uninterrupted free time." (Ex. 209.) Where an officer fails to receive his or her Code-7, LAPD policy requires that the officer submit a greenie and be compensated for the time. (1/24/2008 [Vol.II] at 151:24-153:7.)

Under the FLSA, employers must pay employees for all "hours worked." <u>See</u> 29 U.S.C. §§ 206, 207 (1999); <u>Alvarez</u>, 339 F.3d at 902-903.  It is undisputed that working through an unpaid meal break would constitute "work."

Consequently, Plaintiff must prove by a preponderance of the evidence (1) that he worked overtime hours without compensation; (2) the amount and extent of the work as a matter of just and reasonable inference; and (3) that employer suffered or permitted him to work uncompensated overtime. <u>See</u> 29 U.S.C. § 203(g); <u>Lindow</u>, 738 F.2d at 1061.

11

1

2        1. *Plaintiff's evidence was inadequate to prove*

3          *that Plaintiff worked through his Code-7.*

4

5        Plaintiff testified that although he frequently

6    failed to receive his full Code-7, he never submitted

7    any overtime requests because an unwritten rule

8    prevented him from submitting overtime for less than one

9    hour.[6]  (1/15/2008 [Vol.I] at 149:9-150:17.)

10   Plaintiff's testimony is best examined by looking at

11   each of Plaintiff's assignments.

12

13       a) *Parker Station*

14

15       Plaintiff stated that from approximately May 2003

16   to July 2004, he was assigned to Parker Station, which

17   is a "fixed post" location, 67 times.  (1/15/2008

18   [Vol.I] at  138:6-145:6.)  During the entire assignment,

19   Plaintiff testified that he received his Code-7 less

20   than twice.[7]  (<u>Id</u>. at 142:9-14.)  This testimony was

21   unsubstantiated and unreliable.  Other officers

22   testified that they did receive their breaks while at

23   Parker Station.  (<u>See, e.g.</u>, 1/23/2008 [Vol.II] at

24

---

25       [6]  Plaintiff's testimony was impeached on this matter

26   because he previously stated, at his deposition, that the "unwritten policy" was for time less than half an hour.

27   (1/16/2008 [Vol.I] at 20:8-19.)

28       [7]  While assigned to Parker Station or hospital duty, Plaintiff did not complete a DFAR.

26:17-27:2.](Police Detective, Stephanie Banks, testified that while she was an officer assigned to Parker Station, there was no rule that you could not take your Code-7, and she indeed took each of her Code-7s or submitted overtime requests.)

Plaintiff's supervisors contradicted Plaintiff's testimony and stated that officers assigned to Parker Station were specifically provided a department vehicle to allow the officers to leave the location for their Code-7. (1/16/2008 [Vol.II] at 110:2-6; 180:19-23.) Moreover, it is typical for four to six officers to be assigned to Parker Station at any one time. Testimony was elicited indicating that this mass assignment was done in order to ensure that there was adequate staffing to allow officers to receive their Code-7. (1/16/2008 [Vol.II] at 96:14-16). In the face of this contradictory evidence, Plaintiff's testimony lacked credibility.

Significantly, even if Plaintiff was able to demonstrate he missed his Code-7s, there was insufficient evidence to show that management was aware of Plaintiff's failure to receive any of his Code-7s while at Parker Station. Plaintiff testified that on one occasion he contacted his supervisor and asked that relief officers come and relieve him so that he could receive his break - which is in direct conflict with

Plaintiff's previous testimony that breaks were not permitted - the supervisor failed to send any relief. (1/16/2008 [Vol.II] at 63:4-10.) That supervisor, Captain Miyazaki said that he recalled relaying the request, however, he did not specifically follow-up to ensure that the relief arrived.  (<u>Id</u>. at 155:6-13.)  On balance, this evidence shows that supervisors were unaware of Officer Maciel's alleged missed Code-7s.

b) *Hospital Duty*

Plaintiff also testified that while assigned to hospital duty, he was never permitted to take his Code-7, however, when questioned more fully, Plaintiff admitted that he did receive his Code-7 on most occasions.  (1/16/2008 [Vol.II] at 31:2-5-34:2.)  This testimony suffers from the same credibility issue as most of Plaintiff's testimony.  Further, Plaintiff's testimony was unsubstantiated by any other officer. There was a complete absence of proof that anyone in Plaintiff's chain of command was aware that he was working through his breaks and not being compensated while assigned to hospital duty.  Plaintiff admitted that he never told any supervisor that he was unable to receive his break.  (<u>Id</u>. at 34:3-8.)

///

///

///

14

c) *Newton Station and Central Division*

Plaintiff estimated that he missed his Code-7 a total of 46 times during the relevant time period while assigned to Newton Station. (1/15/2008 [Vol.I] at 148:1-22.; see also Exhs. 216, 217 & 218.) Plaintiff testified that by reviewing his DFARs he believes he missed his Code-7 thirteen times while assigned to Central Division. (Id. at 148:19-22.) Plaintiff reached this estimate by examining his DFARs and counting each time he or his partner failed to document a Code-7 break. (1/15/2008 RT Vol.I 148:7-18.) Plaintiff, however, admitted that there could have been occasions on which the DFAR failed to reflect a Code-7, but one was actually taken. (1/16/2008 [Vol.I] at 57:3-20.) Moreover, because the majority of the DFAR's were completed by individuals other than Maciel, absent some testimony as to the record-keeping practices of those individuals, the evidence in unreliable.

d) *"Unwritten Rule"*

Plaintiff stated that he never submitted any overtime requests for the missed Code-7s because he was told at the academy "if you can eat, you had your Code 7." (1/16/2008 [Vol.I] at 148:9-23.) He also said that he felt "pressure" not to submit overtime slips for less than an hour. (Id. at 17:6-12.) This pressure,

however, did not come from the "department" and instead came from other people he worked with.  (Id.) Plaintiff's testimony directly contradicted his deposition testimony on this subject, indeed, Plaintiff had to admit that during his deposition he stated that he did not feel any pressure and that the alleged unwritten rule pertained to overtime less than half an hour.  (Id.; 1/16/2008 [Vol.I] at 20:8-23.)

Plaintiff acknowledged that had he submitted the overtime slip, he believes he would have been paid, and that he was paid each time he submitted an overtime slip.  (1/16/2008 [Vol.II] at 15:25-17:5.) Plaintiff's testimony lacks credibility in this area.  Specifically, Plaintiff stated that he did not submit overtime for less than an hour, however, payroll records show otherwise.  (Exhs. 220-222.)

Review of Plaintiff's DFARs demonstrate that many times Plaintiff would return to the station from patrol several hours prior to the completion of his shift. (Exhs. 215-218.)  Plaintiff's own partner testified that it was his personal practice, when he takes breaks, to do so at the end of the day, after he returned from patrol.  (1/22/2008 [Vol.II] at 217:10-218:1.) Maciel's partner also stated that he didn't feel any pressure not

to submit overtime reports.[8]  (<u>Id</u>. at 218:3-24.)
Significantly, Maciel's partner said that he did not
always document his Code-7s on his DFAR - many of which
were completed while on assignment with Maciel.  (<u>Id</u>. at
222:8-9.)

Review of the DFARs also shows that where Code-7s
were documented, it was usually when the break was taken
away from the station.  (Exhs. 215-218.) It was not
until more forceful notices came from the Chief of
Police, that Plaintiff and his partners began
documenting Code-7s that were taken at the station.
(Exhs. 215-218.) The evidence did not indicate that
there was a practice of officers failing to take their
breaks.  Rather, most officers said that they received
their Code-7, unless they chose not to take it.  The
evidence indicates that the notices increased the
officers' awareness that the Code-7s needed to be
documented on the DFARs.

If an employee chooses not to take a break, and
then does not inform anyone that he failed to get his
break, he cannot later assert that his employer suffered
or permitted him to work uncompensated overtime.  <u>See</u>

_____

    [8]  Officer Hoskins did testify that sometime prior to 2000,
a supervisor had "not taken it very well" when he attempted to
put in an overtime request for less than an hour, however, that
did not dissuade him from putting in for overtime.  (Id. at
219:4-22.)

17

Lindow, 738 F.2d at 1061.

The Court recognizes that there was some evidence, notwithstanding the above, that the LAPD had an "unwritten rule" not to submit overtime for periods less than an hour. (1/15/2008 [Vol.I] at 52:2-17; 150:17-25; 1/16/2008 [Vol.II] at 92: 17-22.) Testimony was conflicting as to whether this rule was still practiced or whether the department had worked to eradicate the practice of not submitting for less than an hour of overtime. (See, e.g., 1/15/2008 [Vol.I] 152:14-22; 1/16/2008 [Vol.II] at 91:25-92:16; 132:2-134:4; 1/23/2008 [Vol.II] at 134:22-25; 145:23-146:3.)

"Where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of § 207." Nevertheless, "an employer who knows that an employee is working overtime can't stand idly by and allow him to work overtime without compensation even if the employee does not make a claim for overtime compensation." Forrester, 646 F.2d at 414.

Regardless of knowledge, Plaintiff fails to present significant credible evidence indicating either

18

that he worked through his Code-7s, or that management was aware Plaintiff was not submitting overtime requests for missed Code-7s.  Plaintiff's own testimony regarding who knew that he was working through his Code-7s was unclear and contradicted.  The only supervisor to testify that he was aware of officers working overtime and not being compensated was Sergeant Barclay. (1/15/2008 [Vol.I] at 48:8-10) Sergeant Barclay's testimony was fraught with credibility issues, including the fact that Sergeant Barclay is a plaintiff in a similar case against the LAPD.  (Id. at 67:12-69:1.) Nevertheless, even if this evidence were to be accepted, Sergeant Barclay does not qualify as management and, therefore, his knowledge is insufficient to overcome Plaintiff's burden.[9]  Moreover, Sergeant Barclay stated that he was aware that "some" officers were working overtime and not being compensated.  He did not state that he was aware that Plaintiff was working uncompensated overtime.  Id.

     The fact that the LAPD issued several notices to all sworn officers both reminding them of their obligation to submit all overtime slips as well as specifically stating that there is "no unwritten rule," is the most significant evidence tending to indicate

---

[9] Management in the LAPD is defined as Captains and above. These employees are covered by a separate bargaining agreement. (Ex. 207).

that the LAPD had knowledge of officers working undocumented overtime.  (Exhs. 2-5.)  These notices, beginning in 2003, became increasingly more detailed and forceful over time.  (Exhs. 2-5.) The most recent notice, issued in June 2005, included a video message from the Chief of Police and required audits of all DFARs to ensure that employees were properly documenting their Code-7 breaks.  (Ex. 506.)

Notwithstanding the inference that these notices demonstrate knowledge on behalf of management that employees were working undocumented overtime, the notices overwhelmingly demonstrate that management was not "idly standing by" while employees worked for the benefit of the employer.  Quite the contrary, the weight of the evidence shows that beginning, at the latest in 2003, the department was attempting to prevent employees from working uncompensated overtime.

Plaintiff attempted to establish that it was possible for the LAPD to keep track of when, and if he took his required Code-7 break by auditing each DFAR or by having a supervisor note when he took a break.  (See generally 1/16/2008 [Vol.I] at 50:6-12; 51:16-19.) The Court assumes, although it was not clear, that this evidence was presented to demonstrate that Defendant acted recklessly and ignored the fact that Maciel was working undocumented overtime.  This Court, however,

does not understand that it is an employer's burden to hold each employee's hand and ensure that they take their breaks.   Many officers, including Plaintiff, work outside the presence of their supervisors, and are not monitored on a regular basis.   Most significantly, Plaintiff has failed to meet his initial burden to show he worked uncompensated overtime, therefore, notice becomes superfluous.

Consequently, Plaintiff's claims based on missed Code-7s are **DENIED** because Plaintiff was unable to prove by a preponderance of the evidence that he missed any Code-7s or that management was aware of his failure to take his Code-7 breaks.

Further, even assuming Plaintiff was able to meet this burden, he was not able to prove by a preponderance of the evidence the amount and extent of the work as a matter of just and reasonable inference.   <u>See</u> 29 U.S.C. § 203(g); <u>Lindow v. US</u>, 738 F.2d at 1061; <u>Pforr</u>, 851 F.2d at 108 (holding that Plaintiffs' mere estimate of off-the-clock hours worked without pay, was not enough to create a "just and reasonable inference" that defendant "suffered" or "allowed" Plaintiff to work uncompensated overtime).

B. <u>MACIEL'S DONNING AND DOFFING ACTIVITIES ARE COMPENSABLE</u>

It is undisputed that the LAPD does not compensate for the donning and doffing of the standard police uniform, which includes a Kevlar vest and the Sam Browne Belt with all its contents.[10]  Neither party has called into question the validity of the collective bargaining agreement.

For Plaintiff to prevail on this claim, he must prove the following: (1) that the activity of donning and doffing is "work", (2) that donning and doffing is not a preliminary or postliminary activity under the Portal to Portal Act of 1947, and, (3) that the donning and doffing of his personal safety equipment does not fall under the "clothing" exception.  <u>See</u> <u>Muscoda</u>, 321 U.S. at 598; <u>Alvaraz</u>, 339 F.3d at 902-903.

///
///
///
///
///

---

[10] This Court previously granted Defendants' Motion for Summary Judgment as to Plaintiff's claims related to donning and doffing the standard police uniform.  The Court found that, as a matter of law, the uniform was not "specialized safety equipment" and fell within the Section 203(o) exception. The Kevlar vest and Sam Browne with contents, however, potentially fell outside the 203(o) exception.

22

1.   *The Donning and Doffing of the Personal Safety*
     *Equipment Constitutes Work*

Plaintiff's donning and doffing activities constitute "work" because the activity is "pursued necessarily and primarily for the benefit of the employer." <u>Muscoda</u>, 321 U.S. at 598; <u>see also</u> <u>Alvaraz</u>, at 902-903.  Donning and doffing the protective equipment are activities, burdensome or not, performed pursuant to the LAPD's policy of requiring all patrol officers to wear the uniform while on duty.  Thus it is an activity done for the benefit of the LAPD.  <u>See</u> <u>Muscoda</u>, 321 U.S. at 598.

2.   *The Donning and Doffing of the Personal Safety*
     *Equipment constitutes an Integral and*
     *Indispensable Part of the Principal Activities*

First, it is beyond dispute that the donning and doffing of the protective gear is, at both broad and basic levels, done for the benefit of LAPD.  <u>See</u> <u>Alvarez</u>, 339 F.3d at 903. (citing <u>United Transp. Union</u> <u>Local 1745 v. City of Albuquerque</u>, 178 F.3d 1109, 1116 (10th Cir. 1999)).  These Plaintiff-performed activities allow the LAPD to ensure that officers are kept safe, and, more importantly, allow the officers to complete their principal duty of enforcing the laws of the land.

As an example, without the contents of the Sam Browne belt, an officer would not have handcuffs with which to arrest suspects.

Second, most officers are required to wear their personal safety equipment while on duty. Failure to do so can result in discipline. (1/15/2008 [Vol.I] at 211:4-17.) For all practical purposes, the equipment must be donned and doffed at the assigned station. Defendant attempted to argue that it was a mere convenience[11] for officers to dress at the station, thus dressing at home was perfectly acceptable. The evidence presented was not compelling. The LAPD provides officers with lockers at the station in order to store their equipment when not on duty, illustrating LAPD's desire to have such activity take place on-site. (1/15/2008 [Vol.I] at 30:22-25.) Moreover, in order to put on the Kevlar vest, the officer must first remove the uniform shirt, or more logically, wait to put the shirt on until they are at the station. Finally, as a loaded firearm is held within the Sam Browne belt, it would be a significant safety risk to force officers to take this weapon home.

---

[11] See 29 C.F.R. § 790.8(c) (stating that where activities take place at the employer's premises as a mere convenience, that activity would be considered preliminary or postliminary rather than a principal activity).

24

In sum, precedent mandates that Plaintiff's donning and doffing activities be considered "integral and indispensable" to LAPD's "principal" activity.

3. *Donning and Doffing the Personal Safety Equipment Does Not Fall Within the Section 203(o) Exception*

The FLSA contains an exception for "any time spent in changing clothes" that was excluded from compensation under "the express terms of or by custom or practice under a bona fide collective-bargaining agreement." 29 U.S.C. § 203(o) (1999). Here, there is a collective bargaining agreement, as well as a custom and practice of not compensating for the donning and doffing activities. (Exhs. 207-209.) Distilled to its essence, this case requires this Court to decide whether putting on and taking off protective gear constitutes "changing clothes" as that phrase is used in the statute. Neither § 203(o) nor its legislative history defines the phrase, and no binding case law assesses the precise question we address here. The Ninth Circuit has stated in <u>Alvarez</u>, that the relevant inquiry is whether the safety equipment is considered "specialized protective gear." 339 F.3d at 905.

After reviewing the evidence, the safety equipment in this matter does appears to be the type of unique specialized equipment the Ninth Circuit was referring to.  <u>Id</u>. at 902-903.  <u>Alvarez</u> involved the donning and doffing of safety equipment in a meat packing plant.  <u>Id</u>. at 897.  The <u>Alvarez</u> Court lists numerous items that employees of the plant needed to don prior to beginning their shift, each of which provided some safety against the hazards of working in the plant.  <u>Id</u>.

The Ninth Circuit stated that specialized protective gear is different in kind from typical clothing.  "The admonition to wear warm clothing, for example, does not usually conjure up images of donning a bullet-proof vest..."  <u>Id</u>. at 905-906.  The <u>Alvarez</u> Court goes on to say that specialized safety equipment "generally refers to materials worn by an individual to provide a barrier against exposure to workplace hazards."[12]  <u>Id</u>.

This Court is persuaded that Plaintiff's personal

---

[12]  In reaching this conclusion, the Ninth Circuit relies on the following OSHA regulation:  Personal Protective Equipment is specialized clothing or equipment worn by an employee for protection against a hazard. General work clothes (e.g. uniforms, pants, shirts or blouses) not intended to function as protection against a hazard are not considered to be personal protective equipment.  <u>Id</u>. at 905, citing 29 C.F.R. § 1910.1030(b) (1999).

safety equipment is the same type of specialized safety gear the Ninth Circuit concluded was not exempted from compensation under § 203(o).   There was ample testimony that the equipment is specifically designed and necessary for the safety of the officer.   (<u>See</u>, <u>e.g.</u>, 1/17/2008 [Vol.II] at 56:20-57:24.) The Kevlar vest (or bullet proof vest) was even used in <u>Alvarez</u> as an example of the type of equipment that should be excepted from the statute.   <u>Id</u>. at 905-906.   The vest is personally made for the officer and designed to protect the officer from being harmed by suspects.   This is also true of the Sam Browne belt and its contents.   The belt is specially designed to hold each of those items the LAPD believes necessary to protect the officer and ensure they are able to complete their assigned duties. For example, the belt holds their weapon (logically a safety device) as well as ammunition.   It also holds O.C. or pepper spray which can be used to subdue a suspect instead of using a more lethal weapon.   Indeed, each item placed in the belt appears to be an item necessary to ensure that the public and the officer remain safe while on duty.   Therefore, Plaintiff's personalized safety gear does not fall within the 29 U.S.C. § 203(o) exception.

///

///

///

This Court recognizes that sister Districts have resolved this same issue in conflicting ways.[13] Nevertheless, this Court believes this is the result mandated by binding precedent.

### 4. *Cleaning and Maintenance of the Personalized Safety Gear*

Plaintiff alleges that the cleaning and maintenance of the safety equipment should also be compensated. Plaintiff testified that it takes him 15 to 20 minutes per shift to inspect and maintain his gear, including polishing each piece of the leather equipment.[14] The Court finds that Plaintiff is not entitled to any recovery for maintenance activities because he is already provided with adequate compensation under the collective bargaining agreement for the activity.

///

///

---

[13] *Compare* *Abbe v. City of San Diego*, 2007 U.S. Dist. LEXIS 87501 (S.D. Cal. 2007) (Holding that "[t]he term 'clothes' as used in Section 203(o), plainly included all aspects of the [Police Officer] uniform in question, with exception perhaps of the safety gear."); and *Lemmon v. City of San Leandro*, 155 Lab. Cas. (CCH) p35, 376 (N.D. Cal. 2007) (Holding that "even though the [Police Officer] uniform and equipment function as a whole, their donning and doffing are nevertheless subject to the *de minimus* rule.").

[14] For the purpose of this analysis, the Court does not separate Plaintiff's boots from the other leather equipment.

The collective bargaining agreement, to which Plaintiff is bound, specifically addresses these maintenance activities. (Exhs. 207-209.)  Indeed, the relevant agreement has a specific "maintenance and repair stipend."  The weight of the testimony and evidence demonstrates that the stipend was designed to, and does, cover the maintenance costs. (See e.g. 1/16/2008 [Vol.I] at 40:7-9; 1/23/2008 [Vol.V] at 34; 1/23/2008 at 86.)  While Plaintiff testified that he polished his gear himself prior to each shift, the weight of the evidence demonstrates that this was an unreasonable activity.  All other officers testified that they had the option of sending out the equipment for a nominal fee, using a protective cover, or polishing less frequently.  The Court declines to allow Plaintiff to receive additional compensation for these activities.

Consequently, the Court finds that the donning and doffing of the personalized safety equipment is compensable under the FLSA, however, the general maintenance of this same gear is already adequately compensated for.

///

///

///

///

29

5. *Plaintiff's Donning and Doffing Activities Are Not De Minimis*

The Supreme Court in <u>Anderson v. Mt. Clemens Pottery Co.</u>, explained the *de minimis* rule as follows:

> "When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved."

328 U.S. 680, 692 (1946).

When applying the de minimis rule to otherwise compensable time, the following considerations are appropriate: "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." <u>Lindow</u>, 738 F.2d 1057 at 1063.

The evidence before this Court establishes that the donning and doffing of the personalized safety

30

equipment takes between five and ten minutes each day.
While Plaintiff claims that the activity took far
longer, and one witness testified that the activity took
less than two minutes (1/22/2008 [Vol.I] 154:21-155:22),
the weight of the evidence places the time required
between five and ten minutes.  This weighs in favor of
finding the activity de minimis.

Lindow states that it is not merely the time
involved that is considered in determining whether
something should be examined de minimis, but also the
size of the aggregate claim and the regularity with
which the activity takes place.  738 F.2d at 1063.

Courts have granted relief for claims that might
have been minimal on a daily basis but, when aggregated,
amounted to a substantial claim.  (Id. citing Addison v.
Huron Stevedoring Corp., 204 F.2d 88, 95 (2d Cir. 1953)
(less than $1.00 per week not de minimis), cert. denied,
346 U.S. 877, 98 L. Ed. 384, 74 S. Ct. 120 (1953); Glenn
L. Martin Nebraska Co. v. Culkin, 197 F.2d 981, 987 (8th
Cir. 1952) (30 minutes per day over 1 1/2 years not de
minimis), cert. denied, 344 U.S. 866, 97 L. Ed. 671, 73
S. Ct. 108 (1952); Landaas v. Canister Co., 188 F.2d
768, 771 (3d Cir. 1951) ($21.67 to $256.88 per week over
3 years not de minimis); Schimerowski v. Iowa Beef
Packers, Inc., 196 N.W.2d 551, 555-56 (Iowa 1972) (15

minutes per day, amounting to verdicts ranging from $248.04 to $508.44, was not de minimis).  "We would promote capricious and unfair results, for example, by compensating one worker $50 for one week's work while denying the same relief to another worker who has earned $1 a week for 50 weeks."  <u>Addison</u>, 204 F.2d at 95.)

The de minimis rule is concerned with the practical administrative difficulty of recording small amounts of time for payroll purposes. <u>See</u> 29 C.F.R. § 785.47.  Employers, therefore, must compensate employees for even small amounts of daily time unless that time is so minuscule that it cannot, as an administrative matter, be recorded for payroll purposes.  <u>See</u> <u>Lindow</u>, 738 F.2d at 1062-63.

In the instant matter, the activity of donning and doffing the specialized safety equipment must take place prior to each shift, and an average range of how long the activity takes is discernable.  There appears to be no reason why compensation for this activity is too "minuscule" that it cannot be recorded from an administrative standpoint.  Officer Maciel is required to don and doff the equipment prior to every shift, (1/15/2008 [Vol.I] at 211:4-17.)  Thus, when considering the aggregate claim, Plaintiff's claim cannot be classified as insignificant.  On balance, the time it

takes Plaintiff to don and doff the personalized safety equipment is not de minimis.

    6. Reliance on 29 U.S.C. § 259

    Defendant asserts the affirmative defense of reliance on a Department of Labor opinion under 29 U.S.C. § 259.[15]   Section 259 states that no employer shall be subject to any liability or punishment for the failure to pay minimum wages or overtime compensation under the Fair Labor Standards Act if he proves that the act or omission complained of was based on good faith reliance on an opinion of the Department of Labor. Defendant established that in 1985, Plaintiff's Union requested the City look into whether changing into and out of an LAPD officers equipment was compensable.  This request resulted in a meeting between the Department of Labor ("DOL") and representatives of both the union and the City.  Following the meeting, the Department of Labor sent the City an opinion letter stating that the time LAPD officers spent changing into and out of their uniforms, including their protective vests and Sam Browne belts, was not compensable under the FLSA. Defendant argued that reliance on this 1985 DOL opinion letter, establishes a good faith defense under 29 U.S.C.

---

[15] Based on Defendants' refusal to waive the attorney client privilege, Defendants were prohibited from asserting any advice of counsel defense.

§ 259.

In order for an employer to be insulated from liability under Section 259's good faith exception, an employer must "show it acted in (1) good faith, (2) conformity with, and (3) reliance on the DOL's regulations or the Administrator's Opinion Letter." <u>See Frank v. McQuigg</u>, 950 F.2d 590, 598 (9th Cir. 1991) (emphasizing that the employer bears the burden of proof for § 259's good faith exception).  This test has both objective and subjective components, asking how a "reasonably prudent [person] would have acted under the same or similar circumstances" and requiring "that the employer have honesty of intention and no knowledge of circumstances which ought to put him upon inquiry." <u>Id.</u> (quoting 29 C.F.R. § 790.15(a)).  Section 259's test also places on employers an affirmative duty to inquire about uncertain FLSA coverage issues.  <u>Alvarez</u>, 339 F.3d at 907; <u>see Keeley v. Loomis Fargo & Co.</u>, 183 F.3d 257, 271 (3d Cir. 1999) (<u>citing</u> 29 C.F.R. § 790.15(b)).  It is not intended that this [good faith] defense apply where an employer had knowledge of conflicting rules and chose to act in accordance with the one most favorable to him. <u>Alvarez</u>, 339 F.3d at 907; <u>see also</u> 29 C.F.R. § 790.15(d) n.99 (1999)(<u>quoting</u> 93 Cong. Rec. 4390 (1947)).

34

Plaintiff does not contend that the 1985 DOL opinion letter did not exist, nor that the LAPD did not rely upon the letter in determining the compensation policy under the FLSA.  Plaintiff instead states that the LAPD's "continued reliance on the out-dated letter was based on the advice of counsel, not because of the 'clarity' of the DOL's letter." (Plaintiff's Reply Closing Brief, p. 25.)  Because the LAPD chose not to raise an advice of counsel defense, we must evaluate whether the LAPD has shown that it's reliance on the 1985 DOL opinion letter was in good faith, without considering whether counsel was consulted.  See Frank, 950 F.2d at 598.

For the LAPD to have acted in good faith, the evidence must show that a reasonably prudent employer would have acted the same way, and that the LAPD had no knowledge of circumstances which should have put them on notice of any contrary authority.  See id.  The LAPD failed to show sufficient evidence that their reliance on the 1985 DOL letter was the behavior of a reasonably prudent employer.  Chief Bratton, in his testimony, stated that during his tenure as Chief of Police, the LAPD was not relying on such a letter.  Additionally, the DOL opinion letter was issued in 1985, after which numerous claims were brought against the LAPD regarding donning and doffing, and numerous court decisions were

35

rendered regarding compensable activity under the FLSA.[16]   As discussed *infra*, in one of these decisions, Alvarez, the Ninth Circuit even used "bullet-proof vest" as an example of the type of equipment that would be considered specialized, and thus compensable, under the FLSA.   See 339 F.3d at 905.   As an employer, the LAPD had an affirmative duty to inquire and research FLSA coverage issues.   See Alvarez, 339 F.3d at 907. (Emphasizing that the risk of a close good faith case rests on the employer).   The specific mention of bullet-proof vests as specialized equipment should have put the LAPD on notice that the donning and doffing of a Kevlar vest would likely be compensable under the FLSA.   See Frank, 950 F.2d at 598 (stating that an employer may only assert § 259's good faith exception when the employer has "no knowledge of circumstances which ought to put him upon inquiry.")

     There was a complete absence of any evidence demonstrating that the LAPD relied on the DOL letter after the Alvarez decision.   There was also inadequate evidence indicating that the LAPD inquired whether continued reliance 20 years later was reasonable.

---

[16]   See, e.g., Summons and Complaint in Nolan v. City of Los Angeles, U.S.D.C. Central District Case No. CV-03-2190; Summons and Complaint in Alaniz v. City of Los Angeles, U.S.D.C. Central District Case No. CV-04-8592; Settlement Agreement in Brehm v. City of Los Angeles, U.S.D.C. Central District Case No. CV-02-2185.

Simply relying on the content of the 1985 DOL letter,
without more, was not reasonable.

The LAPD chose not to raise an advice of counsel
defense and we may only consider the evidence before the
Court, namely, the 1985 DOL letter itself.  Accordingly,
we find that the LAPD did not present sufficient
evidence to assert Section 259's good faith exception.

C. OTHER ALLEGED PRE-SHIFT ACTIVITIES ARE NOT
   COMPENSABLE BECAUSE PLAINTIFF FAILED TO SHOW
   LAPD SUFFERED OR PERMITTED PLAINTIFF TO WORK

Plaintiff testified that he arrived early for
every shift to check email, fix reports that had been
returned by supervisors, and review Senior Lead
Officer's Reports.  (1/15/2008 RT [Vol.I] at 102:20-
104:10.)  This testimony, however, remained unreliable.
There was also a complete absence of any testimony
corroborating Plaintiff's testimony that he arrived
early to perform the alleged activities.  In fact, each
individual - including Plaintiff's proffered witnesses -
testified that these activities were not required and
could have been completed during the regular work
schedule. (See, e.g., 1/23/2008 RT [Vol.V] at 27:6-28.)
Indeed, Plaintiff himself testified that he many times

left work early, which indicates he had time to check his email during his shift.  There was also evidence that the returned reports and Senior Lead Reports were reviewed during roll call.  (1/16/2008 [Vol.II] 184:9-21.)

Even if the Court were to assume that Plaintiff did arrive early to work for the benefit of the LAPD, there was a complete absence of evidence that management, or anyone besides Plaintiff, was aware of these alleged activities.

Therefore, the Court finds that Plaintiff is not entitled to any recovery for these alleged activities.

Similarly, Plaintiff is not entitled to any recovery for reviewing arrest records at home.  There is little question that the reviewing of arrest records would be a compensable activity.  However, Plaintiff's testimony that he reviewed arrest reports at home on ten separate occasions was not credible.  (1/15/2008 [Vol.I] at 155:24-156:1.)  Other witnesses testified that it was common practice to review the arrest records while the officer was at court waiting to testify - which would be compensable.  (1/23/2008 [Vol.I] at 28:6-30:9; 59:22-60:20; 84:3-85:8.)  Most significantly, there was a complete absence of evidence that any management or even

supervisors, were aware that Plaintiff was taking these arrest records home.   Therefore, recovery is unwarranted.

Finally, Plaintiff testified that he picked up narcotics photographs at the police station prior to traveling to Court to testify.  (1/15/2008 [Vol.I] at 156:2-23.) According to his testimony, he did this on six separate occasions and each occasion took approximately 45 minutes.  (<u>Id</u>.) However, Plaintiff failed to put forth any evidence that anyone other than Plaintiff was aware of this activity, or that this activity would not have been compensated had Plaintiff informed any supervisors.

In sum, Plaintiff is not entitled to compensation for these activities because there is no evidence that Defendants suffered or permitted Plaintiff to engage in these activities.  <u>See Lindow</u>, 738 F.2d at 1061-62.

D. <u>PLAINTIFF IS LIMITED TO A TWO YEAR STATUTE OF LIMITATIONS</u>

An employee is limited to two years of damages for any FLSA violations, absent a showing of willful violations of the FLSA provisions.  29 U.S.C. § 255(a).

Here, there was insufficient evidence to show that Defendant acted with any willful or reckless disregard in either failing to compensate Plaintiff for missed Code-7s or not compensating officers for the donning and doffing activities.   Therefore, Plaintiff is limited to a two year statute of limitations and any damages award is confined to periods not predating December 2003.

E. <u>PLAINTIFF HAS NOT SHOWN THERE WAS ANY VIOLATION OF THE FLSA</u>

The FLSA creates a cause of action where ever a qualified employer fails to compensate for overtime. "Gap time" refers to time that is not covered by the overtime provisions because the time exceeds the internal employer's policy, but does not exceed the straight-time limits under the FLSA.   <u>See</u> <u>Adair v. City of Kirkland</u>, 185 F.3d 1055, 1062 (9th Cir. 1999) (Citing <u>Hensley v. MacMillan Bloedel Containers, Inc.</u>, 786 F.2d 353, 357 (8th Cir. 1986)).   "No violation [of the FLSA's minimum wage requirements] occurs so long as the total weekly wage paid by an employer meets the minimum weekly requirements of the statute, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the minimum hourly statutory requirement."   <u>United States v. Klinghoffer Bros. Realty Corp.</u>, 285 F.2d 487, 490 (2d Cir. 1960)).

The Ninth Circuit has not addressed the issue of whether a gap time claim may be asserted under the FLSA, as distinguished from whatever proceedings may be available for breach of contract or under the collective bargaining agreement.  Compare Lamon v. City fo Shawnee, 972 F.2d 1145, 1150 (10th Cir. 1992) and Monahan v. County of Chesterfield, 95 F.3d 1263, 1282 (4th Cir. 1996).

It appears that only one circuit held that these gap hours should be compensated at the employees' "regular hourly rate."  Lamon, 972 F.2d at 1154. Despite this holding, the majority of courts have held that employees are not entitled to compensation for such time under the FLSA.  Provided the actual number of hours worked divided by the employee's salary at the regular rate does not fall below the minimum wage requirements of the FLSA, a "pure gap time" claim is untenable.  See Monahan, 95 F.3d at 1284; Hensley, 786 F.2d at 357; Robertson v. Board of County Comm'rs, 78 F. Supp. 2d 1142, 1159 (D. Colo. 1999).  This Court finds the latter approach persuasive.

In this context, the FLSA requires overtime be paid for any hours worked over 171[17] per pay period.

_____

[17] See 29 U.S.C. § 207(k); 29 C.F.R. 553.230; see also Monahan, 95 F.3d at 1284 (holding "gap time" was not compensable under the FLSA).

According to the weight of the testimony, Plaintiff, an officer that worked a standard 3/12 shift, worked an average of 152-156 hours per deployment period.  This creates a 15 to 19-hour delta between the two.  There is insufficient evidence for this Court to reasonably infer that Plaintiff ever worked over 171 hours per deployment period and was not compensated for it.

Therefore, Plaintiff cannot maintain a FLSA claim.

**III.  <u>CONCLUSION</u>**

Plaintiff has failed to meet his burden in order to recover in the instant action.  His testimony, and that of his proffered witnesses, was, for the most part, unreliable, unsubstantiated, and lacked credibility.

As to Plaintiff's claims based on missed Code-7 breaks, Plaintiff cannot recover any damages because Plaintiff failed to prove by a preponderance of the evidence that he failed to receive his Code-7s, that any management at the LAPD was aware that he was working through these breaks, or the extent of the missed Code-7s with any reasonable merit.  Based on these facts, this Court rules in favor of Defendant on this claim.

///
///

As to Plaintiff's donning and doffing claims, Plaintiff's testimony that the activity of donning and doffing his uniform took in excess of thirty minutes a day was absurd.  Nevertheless, this Court determines that under Ninth Circuit precedent, the donning and doffing of Plaintiff's personal safety equipment is compensable as a matter of law.  Moreover, this Court also holds that the <u>Lindow</u> factors mandate a finding that the activity is not de minimis.

Notwithstanding the above findings, the Court rules that Plaintiff has failed to prove any violation of the FLSA because Plaintiff failed to put forth sufficient evidence demonstrating that he worked above the 171 hours per deployment period threshold. Therefore, the Court finds in favor of Defendant on this claim.

///
///
///
///
///
///
///
///
///
///

1         As to each of the remaining claims, the Court

2    finds in favor of Defendant.  Plaintiff failed to meet

3    his burden of proof.

4

5

6    **JUDGMENT IS ENTERED IN FAVOR OF DEFENDANT ON ALL CLAIMS.**

7                   RONALD S.W. LEW

8                **HONORABLE RONALD S.W. LEW**

9               Senior, U.S. District Court Judge

10

11   DATE: March 21, 2008

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28